1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  G. D., a minor, by and       )  Case No. **CV 11-2463-JFW (JCx)**
    through his Guardian Ad      )
12  Litem Dien Do and Hong       )  **FINDINGS OF FACT AND**
    Dang,                        )  **CONCLUSIONS OF LAW; ORDER**
13                               )
                  Plaintiff,     )
14                               )
         v.                      )
15                               )
    Torrance Unified School      )
16  District,                    )
                                 )
17                Defendant.     )
    _____ )
18

19

20       This action came on for court trial on December 20, 2011.

21  Bruce Bothwell of the Law Offices of Bruce E. Bothwell appeared

22  for Plaintiff G.D., a minor, by and through his Guardians Ad Litem

23  Dien Do and Hong Dang ("G.D.") and Sharon A. Watt of Filarsky and

24  Watt appeared for Defendant Torrance Unified School District (the

25  "District").  On December 29, 2011, the parties filed their

26  proposed Post-Trial Findings of Facts and Conclusions of Law.  On

27  January 10, 2012, the parties filed Post-Trial Briefs and a Joint

28  Statement Regarding the proposed Post-Trial Findings of Fact and

    Conclusions of Law.

1      After considering the evidence, briefs and argument of

2   counsel, the Court makes the following findings of fact and

3   conclusions of law[1]:

4

5   **I.   FINDINGS OF FACT**

6        **A.   Procedural History**

7        On August 6, 2010, Dien Do and Hong Dang (collectively,

8   "Parents"), on behalf of their son, G.D., filed a request for a

9   due process hearing ("Request") with the California Office of

10  Administrative Hearings.  In their Request, they alleged that the

11  April 28, 2010 individualized education program ("IEP") did not

12  meet the requirements of the Individuals with Disability Education

13  Act ("IDEA") because it did not offer an appropriate school-based

14  behavior program, a home-based behavior program, placement in the

15  least restrictive environment ("LRE"), a program and services for

16  the 2010 extended school year ("ESY"), and goals proposed by

17  Behavioral Education for Children with Autism ("BECA"), a

18  nonpublic agency.  The Request also alleged that the IEP was

19  deficient because of the inadequacy of the speech and language

20  therapy that was offered in the April 28, 2010 IEP, but the

21  Parents withdrew that issue at the due process hearing.

22       The hearing on the Request was held on November 29 and 30,

23  2010 and December 2 and 3, 2010.  The hearing transcript

24  demonstrates that the Administrative Law Judge ("ALJ") was fully

25

26       [1]   The Court has elected to issue its findings in
narrative form.  Any finding of fact that constitutes a
27  conclusion of law is also hereby adopted as a conclusion of
law, and any conclusion of law that constitutes a finding of
28  fact is also hereby adopted as a finding of fact.

engaged in the hearing and questioned the witnesses to ensure that the record contained complete information and to ensure that she fully understood the testimony.  On January 24, 2011, ALJ issued her thirty-four page Decision, which found in favor of the District on all issues and denied G.D.'s requested relief.  In her Decision, the ALJ extensively reviewed the law pertaining to a school district's duty in offering a free appropriate public education ("FAPE").  For example, in her summary of the law, the ALJ discussed a school district's duty to provide a basic floor of opportunity, the evaluation of a district's offer of FAPE, the duties of the IEP team, the methodology used to evaluate the IEP, and the prerogative of a district to select programs, service providers, and methodology for teaching and evaluating G.D.'s skill level.

G.D. appealed the ALJ's Decision to this Court and alleges that the ALJ erred by basing her decision on the appropriateness of the program proposed by the Parents rather than by determining the appropriateness of the District's offer of a FAPE that did not include classroom aide support, appropriate school-based behavior support, or appropriate home-based services; by finding that the measurable annual goals were appropriate; by finding that the program offered by the District was in the LRE; and by finding that G.D. did not require the ESY program.  In his December 6, 2011 Opening Trial Brief, G.D. withdrew from consideration by this Court the issues of whether the April 28, 2010 IEP offered placement in the LRE and whether ESY should have been offered.

**B.    Relevant Background Facts**

G.D. was born on May 3, 2004, and resides with his Parents within the District.  Parents became concerned about G.D.'s development when G.D. was four years old and attending a general education preschool at the El Camino College Child Development Center ("El Camino").  On March 30, 2009, Parents contacted District personnel and expressed their concern about G.D.'s development and made a written request for services.

**1.    April 29, 2009 IEP**

On April 14, 2009, District personnel, which included school psychologist Susan Lee, special education teacher Jennifer Fisher, speech and language pathologist Malia Miyamoto, and ASSISTT[2] teacher Danielle Colin-Wiertz, conducted an assessment of G.D. in order to determine whether he was an individual with exceptional needs.  As part of the District's assessment, Ms. Lee, Ms. Fisher, Ms. Miyamoto, and Ms. Colin-Wiertz observed G.D. at El Camino. Ms. Lee, who has been a credentialed school psychologist since 1990, a special education teacher from 1980 to 1990, and has conducted over 600 assessments of students, observed G.D. for approximately one hour.  During that time, Ms. Lee observed G.D. sitting comfortably next to other children, interacting with other children, looking around with an awareness that his peers were

---

[2]  ASSISTT is an acronym for Autism Spectrum Services & Inclusion Support Torrance Team, which is a team of credentialed special education teachers, behavior analysts, and paraeducators who provide services for children who have autism spectrum disorders and children with moderate to significant disabilities who are included in general education classrooms.

present, and observing the social situation.  According to Ms.
Lee, G.D. did not require any more prompting in following the
routine and playing with toys appropriately than other El Camino
students, and G.D. was able to follow the rules and satisfactorily
transition within the classroom setting from area to area.  Ms.
Fisher, who has been a special education teacher for approximately
10 years, a paraeducator for approximately one year, and has
conducted approximately 80 assessments of preschoolers, observed
G.D. and completed a written evaluation entitled "Fast Facts for
G.D."  In her written remarks, Ms. Fisher noted that G.D. was
smart, friendly, persistent, curious, knew letters and numbers,
was able to write his name, had preacademic skills that were age
appropriate or greater, attended to preferred tasks for up to 20
minutes, sat on the carpet, attempted to participate during circle
time, engaged cooperatively with adults, and verbally communicated
his wants and needs.  Ms. Fisher also reported that G.D. had
delayed play skills, which were at the parallel play stage, and
may have needed redirection when he refused to work.  Ms. Fisher
concluded that G.D. did not have significant delays in social
skills with adults, but Ms. Fisher did have concerns about his
social skills with his peers.  For example, Ms. Fisher observed
that G.D. required prompting to come to the rug but she did not
remember any instance during which G.D. was noncompliant with an
adult directive after such prompting.  However, she also observed
that G.D. would not do what another child asked him to do.

    In addition to the El Camino observations and assessments,
Ms. Lee, Ms. Fisher, Ms. Miyamoto, and Ms. Colin-Wiertz assessed
G.D. at a District school on April 14, 2009.  During that

assessment, G.D. was very compliant, performed the requested tasks with minimal tangible reinforcement, and his attention was good despite the very involved nature of the assessment.

The results of the District's assessments were reported in an April 29, 2009 Transdisciplinary Preschool Assessment Report ("Report"), which concluded that G.D. exhibited autistic-like behavior and demonstrated concept development, pre-academic, fine motor, and self-help skills that were unevenly developed but that were at or above age-appropriate levels.  The Report also concluded that G.D. had age-appropriate receptive language skills but was delayed in his expressive language, pragmatic, gross motor, play, and social skills.

In addition to the assessments and observations conducted by District personnel in order to determine whether G.D. qualified for services under IDEA, on April 28, 2009, G.D.'s then-current level of educational functioning were assessed by a District general education kindergarten teacher, Diane Konishi, who has taught kindergarten and elementary general education classes for 13 years.  Ms. Konishi's assessment was performed as part of the District's "LAUNCH Roundup," which takes place every April in order to determine the kindergarten readiness of age-eligible children within the District.  During the LAUNCH Roundup, G.D. was able to successfully identify the color of each crayon in a box, identify numbers written in random order, and identify the capital and small letters of the alphabet.  Ms. Konishi completed a District Kindergarten Screening/Preppy Referral form for G.D., in which she documented that G.D. had fully mastered five important kindergarten skills, had some difficulty with nine other important

1  kindergarten skills, and had no skill area in which he had a total

2  lack of achievement.

3      On April 29, 2009, an IEP team meeting attended by District

4  staff and G.D.'s mother was convened in order to determine whether

5  G.D. was an individual with exceptional needs and, if so, to

6  develop an IEP that would offer G.D. a FAPE.  The IEP team adopted

7  the recommendation made in the Report that G.D. should qualify for

8  special education because of his autistic-like behavior.  The IEP

9  team also developed a program which provided for placement in a

10 collaborative District preschool classroom generally comprised of

11 eight children with special needs and seven typically developing

12 children through the end of the 2008-2009 school year.  The IEP

13 team also recommended a future IEP team meeting in June 2009 in

14 order to determine whether G.D. should be placed in kindergarten

15 for 2009-2010 school year.  In addition, the IEP team offered G.D.

16 behavior intervention services and speech and language therapy

17 through April 29, 2010.

18

19      **2.   Settlement of the Disputed April 29, 2009 IEP**

20      G.D.'s Parents refused to accept the April 29, 2009 IEP and,

21 instead, arranged for G.D. to continue attending El Camino until

22 the 2009-2010 school year, at which time they enrolled G.D. at

23 Crossroads Learning Center ("Crossroads"), a private general

24 education preschool.  In Spring 2009, Parents retained the

25 services of B. J. Freeman, Ph.D., who assessed G.D. and

26 memorialized the results of her assessment in a Psychological

27 Assessment report dated May 21, 2009.  In her report, Dr. Freeman

28 concluded that G.D. was autistic and recommended that G.D. should

attend preschool rather than kindergarten during the 2009-2010 school year.  Dr. Freeman did not observe G.D. at El Camino, did not ask his El Camino teacher to complete any survey or other report, and apparently did not interview G.D.'s El Camino teacher as part of her assessment.

In or about August 2009, as G.D. began attending Crossroads, G.D.'s Parents privately retained BECA to assess G.D. and to devise a program to address his alleged behavioral deficits. Gregory Elsky, Psy.D., BECA Associate Director, observed G.D. for one or two hours in G.D.'s home in or about August 2009, and without the presence of any of G.D.'s peers.

On August 19, 2009, G.D.'s Parents filed a request for due process because they alleged that G.D.'s April 29, 2009 IEP was deficient.  The matter was settled on December 28, 2009, without the need for a hearing.  The parties entered into a settlement agreement which provided, among other things, that if the Parents did not consent to G.D.'s Spring 2010 IEP, which would be developed at the annual review, G.D.'s stay put placement for the 2010-2011 school year would be in a District general education kindergarten class with behavioral support from BECA at the beginning of the year, with transition from BECA to a District aide commencing after the first four weeks of school, as well as speech and language therapy.

### 3. Investigation Conducted In Preparation for the April 28, 2010 IEP

G.D. remained at Crossroads throughout the 2009-2010 school year.  According to Dr. Elsky, as of November 14, 2009, BECA had

8

1   reduced the duties of G.D.'s one-to-one aide to that of a shadow

2   aide and data was no longer collected on G.D.'s progress in

3   achieving goals because of G.D.'s success in the classroom, which

4   included sitting and participating in circle time for an average

5   of twenty-three minutes, participating and answering questions,

6   and singing songs.

7        In Spring 2010, the members of G.D.'s 2010 IEP team, ASSISTT

8   behavior analyst[3] Mandy Juarez, District special education teacher

9   Susan Weiner, District program specialist Tami Dowgiewicz, and

10  Jennifer Fisher, began preparing for the annual review of G.D.'s

11  need for special education and related services by, among other

12  things, observing G.D. at Crossroads.

13

14                      **(a)  Mandy Juarez**

15       Ms. Juarez, who has worked as a District behavior analyst for

16  four years and is a board certified associate behavior analyst,

17  observed G.D. at Crossroads while he was on the yard and in the

18  classroom during circle time and seatwork for approximately one

19  hour in order to determine the appropriate services required for

20  G.D.  On the yard, Ms. Juarez was only able to observe G.D. lining

21  up with his classmates at the end of recess, after which he

22  transitioned to the classroom by washing his hands and preparing

23

24       [3]  An ASSISTT behavior analyst is an individual who
25  designs and supervises the implementation of programs for
    autistic children and other disabled children who receive
26  inclusion support services.  These tasks are carried out by,
    among other things, collecting, maintaining, and analyzing
27  data, attending IEP team meetings, developing measurable
    annual goals, reporting on progress towards the goals,
28  consulting with teachers and paraeducators on strategies to
    assist pupils in achieving their goals, supervising and
    overseeing ASSISTT staff, and training paraeducators.

for the next activity.  Once inside the classroom, Ms. Juarez
observe that the proximity of the BECA aide to G.D. varied
depending upon the activity but G.D. was always within sight of
the aide.  Ms. Juarez reported that, during circle time, G.D. sat
near the front of the rug and the BECA aide sat at the back of the
rug, and during seat work, the BECA aide was seated away from
G.D.'s table but did move to G.D. to provide some prompts.  The
aide's prompts consisted of gestures and visual cues from across
the room, and verbal and physical prompts when she approached
G.D.'s area.  During  play-based activities in the classroom, G.D.
interacted with two peers, although the duration of the
interactions was relatively brief.  G.D. followed his teacher's
directions, appropriately asked for assistance when needed,
remained focused on task, and transitioned after completing tasks.
Ms. Juarez noted that G.D. actively worked on a notebook activity
and, when the activity was completed, he independently put his
materials away by placing them in a cabinet.  In addition, he
appropriately transitioned from his choice of free play to
rug/circle time.

### (b)  Susan Weiner

In approximately March 2010, Ms. Weiner, who has worked as a
special education teacher for 11 years, observed G.D. at
Crossroads for approximately one to one and one-half hours during
snack/recess, circle/rug time, and center-based time that
consisted of art activities, and she found that G.D. was
comfortable and familiar with the routine.  At recess, G.D. built
a tower and a tunnel in the sand with another child and had a

10

discussion with that child for approximately fifteen to twenty minutes with only one prompt from his BECA aide.  During center time, the BECA aide did not interact with G.D. and, while G.D. worked on his art project, the BECA aide was present in the room but only observed G.D.  Ms. Weiner never observed noncompliance or tantrums by G.D. and she described G.D.'s behavior as similar to a typical child, and she noted that he ran inside, transitioned fine, washed his hands, and went to the restroom without priming[4] or prompting.  Ms. Weiner also had a 20 minute discussion with G.D.'s teacher at Crossroads about his progress and was informed that academics was an area of G.D.'s strength and not really an area of concern, that G.D. knew most of his letters and sounds, and that G.D. required work with reading comprehension.  The Crossroads teacher also informed Ms. Weiner that G.D. required prompting at times in order to follow the classroom routine but that the level of prompting was very minimal, even during the absence of a BECA aide, and that G.D. fit in with the class and played well with all the other students.

### (c)   Tami Dowgiewicz

Ms. Dowgiewicz, who has been a District program specialist for three years, has taught students with disabilities for five years, and was a resource specialist for four years, observed G.D. at Crossroads for approximately one hour, during which time G.D. performed table top activities, transitioned between activities, and sang songs in a group.  Ms. Dowgiewicz noted that when

---

[4]   Priming is the preparation of an individual for an upcoming action or event by informing the individual of the action or event in advance.

1  instructed by his teacher, G.D. was able to transition between

2  activities by getting up and taking a book out of the closet,

3  sitting down, turning to a particular page, tracing the letters

4  and shapes on that page, and then transitioning to a group

5  activity in which the pupils sang songs and danced, all of which

6  G.D. did independently.  During these activities, G.D.'s BECA aide

7  interceded twice, once to assist in instructing G.D. and other

8  pupils to move off the rug, and once to talk with G.D. for

9  approximately ten seconds to determine how he was doing.

10 Otherwise, his BECA aide sat in her chair for fifty-eight of Ms.

11 Dowgiewicz's sixty minute observation.  In addition, Ms.

12 Dowgiewicz observed G.D. interacting with his peers when he helped

13 a peer find the right page, interacted with peers in a group, and

14 acted in a manner that was more appropriate than some of the other

15 pupils in the class.  Ms. Dowgiewicz summarized G.D.'s present

16 levels of functioning, based upon her observation of him at

17 Crossroads as being on task, completing his work, capable of

18 transitioning, and, in general, being totally engaged and looking

19 very, very much on target for how a child should look when coming

20 into kindergarten.

21

22                    **(d)   Jennifer Fisher**

23      In or about March or April 2010, Ms. Fisher observed G.D. at

24 Crossroads.  During circle time, G.D. received  no classroom

25 assistance from his BECA aide and had no difficulty communicating

26 with peers.  G.D. was able to independently participate in circle

27 time, which included singing songs, pantomiming to the lyrics, and

28 reciting prayers or Bible verses.  G.D. was also able to

1  independently transition from circle time to snack time,
2  communicate with his peers in the classroom, and to engage with
3  peers during snack time.  During snack and outside time, the BECA
4  aide redirected G.D. to an area where his peers were located so
5  that he could participate in their activities.

6      On the basis of her Crossroads observations, discussions with
7  G.D.'s Crossroads teacher, and a review of the BECA reports, Ms.
8  Fisher summarized G.D.'s present levels of performance in an April
9  2010 "Fasts Facts," and concluded that G.D. was friendly,
10 persistent, happy, and smart.  She also concluded that G.D.
11 attended to his assigned tasks during the school day, sat on the
12 carpet as long as his classmates, independently participated in
13 circle time, cooperatively engaged with adults, followed group
14 instruction, understood classroom rules, enjoyed circle time
15 activities, verbally expressed his wants and needs, did not
16 require supervision during snack, engaged in symbolic play, and
17 initiated play with peers.  On a Kindergarten Readiness List, Ms.
18 Fisher noted that G.D. had mastered 13 important skills, had
19 emerging skills in 3 skill areas, and had no complete lack of
20 skills in any skill area.

21

22                    **(e)   BECA**

23     In approximately February 2010, a month or two before the
24 Crossroads observations by the IEP team members, Anthony
25 Alberding, who has been a BECA educational consultant since 2008,
26 assumed responsibility for determining the nature of BECA services
27 that would be provided to G.D.  Prior to Mr. Alberding assuming
28 his duties, BECA personnel had determined that G.D. had difficulty

with expressive language, which impacted his socialization.  Mr.
Alberding initially observed G.D. at Crossroads on February 11,
2010, for approximately two hours.  During his observations, G.D.
pledged allegiance to the United States, to the Bible, and to the
Christian flag during circle time, sang a Bible song, and, because
his best friend was not present, engaged in solitary play during
recess for approximately 15 to 20 minutes before interacting with
another peer.

On April 15, 2010, Mr. Alberding again observed G.D. at
Crossroads, and he observed G.D. playing appropriately with cars
during free time and independently joining an activity with his
peers at another table.  Mr. Alberding also observed G.D. for
three hours on April 19, 2012, and noted that while G.D. exhibited
an increase in shouting out answers and responses without raising
his hand, he was attentive and not disruptive during circle time.
Based on his observations, Mr. Alberding was unable to conclude if
the presence of G.D.'s BECA aide contributed to his success
because the aide was always present, even if only acting as a
shadow.  BECA never observed or tested G.D.'s abilities without
the presence of his BECA aide.


### (f)  G.D.'s Mother

According to G.D.'s Mother, at about the time of the Spring
2010 IEP team meeting, G.D. was able to initiate play on the
playground with other children by G.D. saying hello, asking if the
child wanted to play with him, and then engaging in joint play.
G.D.'s Mother also testified that G.D. continued to have

difficulty describing things, understanding wh- questions[5],
engaging in pretend play, sustaining play that he initiated,
communicating intent during play, and sustaining attention in
completing tasks.

### 4.   April 28, 2010 IEP

On April 28, 2010, G.D.'s IEP team conducted the Spring 2010
annual review, during which time the IEP team developed goals for
the forthcoming year, determined the services that G.D. required
in order to access the curriculum, and determined the placement
and setting in which G.D. should receive special education
services.  Ms. Juarez wrote the proposed goals, and those goals
required G.D. to maintain and generalize his social skills across
social play opportunities, as demonstrated by initiating and
joining in group play activities, responding to play statements,
sustaining play, and appropriately transitioning between play
activities for the duration of recess without adult assistance.
The IEP team also developed goals that required G.D. to produce
four to six word sentences when interacting with peers; to use
appropriate eye contact during interactions; to respond to who,
what, when, where, and why questions by using four to six word
sentences with correct syntax and grammar; to respond to who,
what, when, where, and how questions about an instructional level
text; to correctly produce age-appropriate phonetic sounds; to
determine a reasonable spelling using pre-phonetic knowledge,
letter sounds, and knowledge of letter names; to create a number

---

[5]   Wh- questions are those that ask who, what, why, or
where.  Questions that ask "how" are often part of goals
involving wh- questions.

sentence of addition and subtraction word problems by using
drawings or manipulatives to model the problem; and to follow the
classroom routine.

G.D.'s Spring 2010 IEP team also considered ten goals that
had been proposed by BECA prior to the meeting.  Those goals were
designed to address G.D.'s inability to tolerate some frustration,
to independently transition between play activities, to respond to
his name being called when engaged in a preferred activity, to
account for the visual perspective of others, to engage in
appropriate play behavior with his peers, to appropriately use
nouns, to use wh- questions, to respond to wh- questions, to
independently join peers' conversations, and to provide
directions, instructions, and explanations.  The proposed BECA
goals were incorporated into the IEP, as appropriate, combined
into or subsumed by a more global goal, or not included because
the IEP team determined that they were either inappropriate or
unnecessary.  In addition to considering and incorporating BECA's
proposed goals into the IEP, the IEP team also relied on BECA's
proposed  goals in determining G.D.'s present levels of
functioning in specific areas, or "baselines."


     **5.   Results of the April 28, 2010 IEP**

G.D.'s April 28, 2010 IEP team offered placement in a general
education kindergarten classroom and related services that
included group behavior intervention services for fifteen minutes
each school week, provided by ASSISTT; consultative behavior
intervention services for twenty minutes per consultation, with
two consultations per school week, provided by ASSISTT;

specialized academic instruction and consultation for thirty
minutes per consultation, with three consultations per school
week, provided by a learning center teacher; individual speech and
language therapy for thirty minutes each school week; and small
group speech and language therapy for thirty minutes each school
week.

The direct ASSISTT services would be provided either during
recess or lunch in a natural environment, such as the play yard or
at the lunch benches.  The direct ASSISTT services could be either
passive support, such as taking data and observing, or active
support, such as prompting G.D. to use specific language or
skills, prompting other pupils to approach or interact with G.D.,
or directing or initiating play in order to draw in others.  The
direct ASSISTT services would be overseen by Ms. Juarez as part of
her regular duties.  The ASSISTT consultations would consist of
direct work with G.D. during classroom social playtimes, speaking
with the teacher, providing the teacher with strategies in
presenting instruction to G.D., or identifying opportunities for
reinforcement by a supervisor or an assistant.  ASSISTT would also
implement the goal that required G.D. to maintain and generalize
his social skills across social play opportunities through
priming, providing G.D. with the language to use for initiation of
play, identifying activities with which G.D. might want to
participate in, priming and practicing the language before G.D.
approached peers, and then fading the prompts and priming and,
instead, assisting G.D. with increasing his responses to play
statements and sustaining play.

1    Learning center support was also offered for three sessions
2    per school week, thirty minutes per session, in order to address
3    reading comprehension, wh- questions, phonetics, behavior, and
4    social skills.  Based on G.D.'s level of functioning as of April
5    28, 2010, the District members of the IEP team concluded that G.D.
6    did not require home-based services.  In addition, the April 28,
7    2010 IEP team considered whether G.D. would require an
8    instructional assistant or paraeducator, and decided that such
9    support was unnecessary because G.D. was functioning independently
10   throughout the school day, was on target, participated in the
11   classroom, was academically on par with his peers, had appropriate
12   behaviors, was not disruptive, and did not require additional
13   attention.

14

15               **6.   G.D. Was Provided Services Pursuant to the "Stay**
16                    **Put" Provisions of the Settlement Agreement**

17   G.D.'s Parents refused the April 28, 2010 IEP offer of a FAPE
18   and G.D. remained enrolled at Crossroads until Fall 2010, at which
19   time, pursuant to the earlier settlement agreement, G.D. entered a
20   District general education kindergarten class.  G.D. was placed in
21   Ms. Konishi's kindergarten class at Lincoln Elementary School, and
22   was provided stay put BECA services for the initial four weeks of
23   the term.  Thereafter, behavior intervention services were
24   transitioned to a District paraeducator, Ms. Garcia.[6]  G.D. was
25   also provided speech and language therapy.

26

27   _____

28       [6]   G.D.'s Parents, by filing for due process with respect
     to the April 28, 2010 IEP, invoked the stay put provisions of
     the settlement agreement.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction And Venue

This case involves a review of a hearing officer's decision regulated by the IDEA.  As such, the Court has original jurisdiction over this matter under 20 U.S.C. § 1415(i)(3)(A).

Venue in the United States District Court for the Central District of California is properly invoked pursuant to 28 U.S.C. § 1391(b) on the grounds that the events giving rise to the District's claim occurred in the Central District of California.

The parties do not dispute the facts necessary for federal jurisdiction and venue.

### B.   Standard Of Review

The standard for the District Court to review an administrative decision under IDEA is set forth in 20 U.S.C. § 1415(i)(2)(C).  That section requires the decision to be supported by a preponderance of the evidence, and provides as follows:

> In any action brought under this paragraph, the court –
>
> (i) shall receive the records of the administrative proceedings;
>
> (ii) shall hear additional evidence at the request of a party; and
>
> (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

This modified *de novo* standard requires that "due weight" be given to the administrative proceedings.  *Bd. of Educ. v. Rowley*, 458 U.S. 176 (1982).

1    Judicial review under IDEA is less deferential than in most

2    administrative cases. *J.L. v. Mercer Island School Dist.*, 592

3    F.3d 938, 949 (9th Cir. 2010). When a party challenges the

4    outcome of an IDEA due process hearing, the reviewing Court

5    receives the administrative record, [and] hears any additional

6    evidence" and "basing its decision on the preponderance of the

7    evidence," can grant relief as the Court determines is

8    appropriate. 20 U.S.C. § 1415(i)(2)(C). In applying the

9    preponderance of the evidence standard, the Court must reach

10   "independent" decisions. *Rowley*, 458 U.S. at 205.

11   Nonetheless, "[b]ecause Congress intended states to have the

12   primary responsibility of formulating each individual child's

13   education" this Court must give "'due weight' to the decisions of

14   the states' administrative bodies." *Hood v. Encinitas Union*

15   *School Dist.*, 486 F.3d 1099, 1104 (9th Cir. 2007) (internal

16   citations omitted). The amount of deference afforded to the ALJ's

17   decision is subject to the Court's discretion. *Gregory K v.*

18   *Longview School District*, 811 F.2d 1307 (9th Cir. 1987). In making

19   that determination, the thoroughness of the hearing officer's

20   findings should be considered, with the degree of deference

21   increased when the findings are thorough and careful. *Capistrano*

22   *Unified Sch. Dist. v. Wartenburg*, 59 F.3d 884, 891-92 (9th Cir.

23   1995). "[S]ubstantial weight" should be given to the hearing

24   officer's decision "when it 'evinces his careful impartial

25   consideration of all the evidence and demonstrates his sensitivity

26   to the complexity of the issues presented.'" *County of San Diego*

27   *v. California Special Education Hearing Office*, 93 F.3d 1458, 1466

28

1  (9th Cir. 1996) (*quoting Ojai Unified Sch. Dist. v. Jackson,* 4 F.3d

2  1467, 1476 (9th Cir. 1993)).

3      Accordingly, any "'thorough and careful' findings of a

4  hearing officer are entitled to deference." *Hood*, 486 F.3d at

5  1104; *see also Wartenburg*, 59 F.3d at 891-92 (holding that "[t]he

6  hearing officer's report was especially careful and thorough, so

7  the judge appropriately exercised her discretion to give it quite

8  substantial deference"); *Jackson,* 4 F.3d at 1476 (9th Cir. 1993)

9  (holding that a hearing officer's decision is entitled to

10  "substantial weight" where the "decision evinces his careful,

11  impartial consideration of all the evidence and demonstrates his

12  sensitivity to the complexity of the issues presented");

13  *California Special Education Hearing Office*, 93 F.3d at 1467

14  (holding that hearing officer's decision was entitled to

15  substantial weight because it was "intensive and comprehensive");

16  *Glendale Unified Sch. Dist. v. Almasi,* 122 F. Supp. 2d 1093, 1100

17  (C.D. Cal. 2000) (giving the hearing officer's decision

18  "substantial weight" where the hearing officer issued a lengthy,

19  detailed opinion, supported her findings with testimony and

20  documentary evidence, and her decision was impartial and her

21  reasoning was sensitive to the complexities of the case).

22      In addition, the Court must "not substitute [its] opinions of

23  sound educational policy for those of the school authorities which

24  [it is] reviewing." *Adams v. State of Oregon*, 195 F.3d 1141, 1149

25  (9th Cir.1999); *see also K.D. v. Department of Education*, 665 F.3d

26  1110, 1117 (2011) (holding that Court "must give due weight to

27  judgments of education policy when reviewing state hearings and

28  must take care to not substitute our own notions of sound

21

educational policy for those of the school authorities we review")
(internal citations and quotations omitted).  However, "the court
is free to determine independently how much weight to give the
state hearing officer's determinations." *Ashland Sch. Dist. v.
Parents of Student R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009).
Deference should generally be given to the state hearing officer's
findings when they are "thorough and careful."  *K.D.*, 665 F.3d at
1117.

The ALJ's Decision in this matter, like the *Wartenburg* and
*California Special Education Hearing Office* cases, was not only
"thorough and careful," but also "intensive and comprehensive."
The ALJ's thirty-four page, single spaced Decision provided a
thorough discussion and application of the facts of this matter to
the relevant legal contentions made by the parties.  The ALJ fully
and completely explained the basis of her opinions, the inferences
she drew from the testimony and the documentary record, and her
rationale for affording greater weight to certain evidence and
testimony.  As a result, the ALJ's Decision is clearly entitled to
substantial deference as discussed in more detail below.

### C.   Additional Evidence

On August 26, 2011, G.D. filed a motion seeking to supplement
the administrative record with additional evidence consisting of
the following: (1) IEP meeting documents from February 25 and
April 28, 2011, and an email exchange between special education
teacher Susan Weiner and G.D.'s mother Hong Dang from March 14 and
March 15, 2011 regarding paraeducator support for G.D.; (2) oral
testimony of Ms. Weiner and Ms. Dang regarding the above

documents, and (3) additional testimony by Ms. Weiner regarding
the services offered.

On September 30, 2011, Judge Valerie Baker Fairbank issued an
order deferring in part and denying in part G.D.'s motion to
supplement the record.  Judge Fairbank denied G.D.'s request to
supplement the administrative record with the additional witness
testimony, and took under submission until after the trial the
issue of whether to permit G.D. to supplement the administrative
record with additional documents.[7]

When the results of the administrative hearing are appealed
to the district court, the court "shall hear additional evidence
at the request of a party." 20 U.S.C. § 1415(i)(2)(C)(ii).  In
determining whether to supplement the administrative record with
additional evidence, the proper inquiry is whether the additional
evidence is "relevant, non-cumulative and otherwise admissible."
*E.M. v. Pajaro Valley Unified School*, 652 F. 3d 999, 1005 (9th
Cir. 2011).  Additional evidence may be excluded where it repeats
or embellishes evidence from the administrative hearing, or
changes the character of the hearing from one of review to a trial
de novo.  *Id.* at 1004.  Evidence from events subsequent to the
administrative hearing bearing on the child's condition may help
determine the reasonableness of a school's action at the earlier
date.  *Id.; see also Ojai Unified School Dist v. Jackson*, 4 F.3d

---

[7]  On October 26, 2011, this action was transferred to
this Court by Notice of Reassignment of Case Due to
Unavailability of Judicial Officer.  Judge Fairbank's
decision is law of the case.  However, to the extent her
decision is not law of the case, this Court has independently
reviewed Judge Fairbank's decision denying G.D.'s request to
supplement the administrative record with the additional
witness testimony and concurs in her decision.

1467, 1472-73 (9th Cir. 1993).  Even if it would have been

impossible for the school to account for such evidence because it

was unavailable at the time of the decision, the Ninth Circuit has

held that the intent of the statutory mandate is that prior

actions should be reviewed with the help of subsequently available

evidence.  *Pajaro Valley*, 652 F.3d at 1005.

In this case, G.D. argues that the IEP meeting documents and

email exchange show that the District recognized that G.D.

required some level of classroom aide support and therefore this

evidence is relevant to whether such services should have been

offered in the April 28, 2010 IEP.  However, the District argues

that G.D. admitted at the administrative hearing that the

assessments of G.D. conducted in October and November of 2010 were

not relevant to G.D.'s needs in April 2010, and because the

assessments reflected in the proffered documents were conducted

even later in time, they are not relevant to the appropriateness

of the April 28, 2010 IEP.

The Court agrees with the District and denies G.D.'s request

to supplement the administrative record with the 2011 IEP meeting

documents and email exchange because those documents admittedly

are not relevant to the issue of the appropriateness of the April

28, 2010 IEP.  *See, e.g., Pajaro Valley*, 652 F.3d at 1006 (holding

that, when considering the admissibility of after-acquired

evidence, "[t]he proper inquiry was whether the [evidence] was

relevant, non-cumulative, and otherwise admissible").  In this

case, the 2011 IEP meeting documents and email exchange were

created several months after the April 28, 2010 IEP, and G.D. has

failed to demonstrate how his behavior at that time, well after

1  the implementation of the agreed upon stay put services, are

2  relevant to and support a conclusion that the services proposed in

3  the April 28, 2010 IEP were inappropriate or otherwise demonstrate

4  that, at the time of the April 28, 2010 IEP, G.D. required some

5  level of classroom aide support.

6      The fact that the District recommended a paraeducator or aide

7  for G.D. in February 2011 does not support the conclusion that

8  such support was required at the time of the April 28, 2010 IEP.

9  Although not relevant, the District's recommendation demonstrates

10 that the District appropriately responded to a change of

11 circumstances and recognized G.D.'s need for a paraeducator or

12 aide and promptly recommended that such support be made available

13 to G.D.  *See, e.g., Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir.

14 2009) ("And more importantly, if services added to a later IEP

15 were always used to cast doubt on an earlier one, school districts

16 would develop a strong disincentive against updating their IEPs

17 based on new information.  This scenario is the exact opposite of

18 what Congress intended when it provided for regular review and

19 revision of IEPs, . . . , and it would do little to help the

20 interst of disabled children").

21

22      **D.   The April 28, 2010 IEP Offered to G.D. Constituted a**

23           **FAPE**

24      The Supreme Court held in *Board of Education v. Rowley*, 458

25 U.S. 176 (1982), that the IDEA does not require school districts

26 to provide special education students with the best education

27 available, or to provide instruction that maximizes the student's

28 abilities.  Instead, school districts are required only to provide

a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefits to the student, and the choice of methodology in providing special education and related services is the prerogative of the school district. *C.P. v. Prescott Unified School District*, 631 F.3d 1117, 1122 (9th Cir. 2011) (holding that IDEA allows educators the discretion to select from various methods in order to meet the individualized needs of a student if those practices are reasonably calculated to provide educational benefit).

The District offers a "free appropriate public education if the program (1) addresses the child's unique needs, (2) provides adequate support services so that the child can take advantage of the educational opportunities, and (3) is in accord with the individual educational program." *Wartenberg*, 59 F.3d at 893 (*citing Rowley*, 458 U.S. at 188-89); *see also Katherine G. v. Kentfield School District*, 261 F.Supp. 2d 1159, 1171-72 and n. 12 (N.D. Cal. 2003).

Under *Rowley* and the applicable federal and state statutes, the standard for determining if a school district's provision of services substantively and procedurally provides a FAPE involves consideration of four factors: (1) services designed to meet the student's unique needs; (2) services reasonably designed to provide some educational benefit; (3) services conform to the IEP as written; and (4) the program offered must be designed to provide the student with the foregoing in the least restrictive environment. The program developed by the school district must result in more than minimal academic advancement and the

1  educational benefit is measured by the degree to which a student
2  succeeds in achieving progress on the goals established by the
3  IEP.

4      Only the first two factors are at issue before this Court –
5  whether the program in the April 28, 2010 IEP addressed G.D.'s
6  unique needs and whether that program was reasonably designed to
7  provide the required educational benefit to G.D.  G.D. alleges
8  that the April 28, 2010 IEP failed to meet G.D.'s unique needs and
9  was not designed to provide meaningful benefits.  The District
10  contends that the IEP adequately addressed G.D.'s weaknesses and
11  unique needs, and that G.D. made progress in all areas.

12      As explained below, the Court finds that G.D. has not
13  established that the April 28, 2010 IEP offered violated IDEA or
14  state law.

15
16          **1.    Behavioral Services**
17              **a.    School Based Services**
18      G.D. argues that the District failed to provide him a FAPE
19  because the April 28, 2010 IEP failed to offer appropriate
20  behavior support in the classroom.  However, the Court finds the
21  evidence amply supports the ALJ's findings that the April 28, 2010
22  IEP addressed G.D.'s needs, provided meaningful benefits, and
23  constituted a FAPE, especially given the due deference to which
24  the ALJ's findings on this issue are entitled.  As of April 28,
25  2010, BECA support for G.D. in the classroom was minimal, and G.D.
26  was interacting with others more appropriately and attending to
27  tasks more effectively than many of his typically developing
28  peers.  In fact, G.D. showed significant progress since his

initial IEP team meeting, including the ability to function
independently in the classroom for the majority of the school day,
interacting and playing independently with peers during free time
with minimal redirection.  G.D. generally required no more support
in the classroom than would be otherwise provided by the structure
and guidance supplied by a general education teacher.

In addition, witnesses for both G.D. and the District agreed
that a key component of G.D.'s social deficits resulted from the
delayed development of his language skills.  In fact, Dr. Freeman
opined that communication was a contributing factor in G.D.'s lack
of socialization skills because his language and speech issues
affected his ability to meaningfully interact with his peers, and
that language, in particular, was probably holding G.D. back.
BECA personnel, including Mr. Alberding, testified that G.D. had
difficulty with expressive language, which also impacted his
socialization skills.  However, the District clearly recognized
and considered those concerns, because the District included
provisions for language and speech therapy for G.D. in the April
28, 2010 IEP.

Accordingly, the Court concludes that the behavioral services
offered in the April 28, 2010 IEP were adequately designed to
address G.D.'s unique educational needs, were reasonably
calculated to provide G.D. with the required educational benefit,
and constituted a FAPE.

### b.   Home Based Services

G.D. argues that the District failed to provide him a FAPE
because the April 28, 2010 IEP discontinued the five hours per

week of home based behavior services, which were services
recommended by BECA.  However, the Court finds the evidence amply
supports the ALJ's findings that the April 28, 2010 IEP offered
did address G.D.'s needs, provided meaningful benefits, and
constituted a FAPE, especially given the due deference to which
the ALJ's findings on this issue are entitled.  Ms. Juarez
testified that G.D. did not require home based services because
G.D.'s level of need was not significant, and he was exhibiting a
sufficient level of skills at school.  At the administrative
hearing, there was ample evidence presented that established that
G.D. demonstrated a sufficient number of necessary skills that
obviated the need for home based services.  The evidence
demonstrated that those skills included G.D.'s successful
placement in a general education setting, identification of
friends and peers, engaging in classroom activities, engaging in a
number of play activities, and being academically on target.

In addition, G.D.'s Mother admitted that she had seen an
overall improvement in G.D.'s performance, and the skills
identified by the BECA's home based services – such as remaining
quiet, making eye contact, and attending to tasks – were skills
that G.D. had mastered in the classroom.  Although G.D.'s Mother
testified that she believed that G.D. needed home based services,
her testimony was not persuasive.  Even if the home based services
preferred by G.D.'s Mother might have resulted in a greater
educational benefit to G.D., the District is not required to offer
such services so long as the program offered was designed to
address G.D.'s unique educational needs and was reasonably
calculated to provide G.D. with the required educational benefit.

Accordingly, the Court concludes that the behavioral services offered in the April 28, 2010 IEP, even though those services did not include home based behavioral services, were designed to address G.D.'s unique educational needs, were reasonably calculated to provide G.D. with the required educational benefit, and constituted a FAPE.

### 2.   Failure to Include BECA Behavior Goals in the IEP

G.D. argues that the District failed to provide him a FAPE by failing to develop and incorporate appropriate goals in the April 28, 2010 IEP because the behavioral goal for G.D. to maintain and generalize social skills across play opportunities should have been separated into multiple goals, including the ten goals proposed by BECA.  However, the Court finds the evidence amply supports the ALJ's findings that the April 28, 2010 IEP offered addressed G.D.'s needs, provided meaningful benefits, and constituted a FAPE, especially given the due deference to which the ALJ's findings on this issue are entitled.  The IEP goals were appropriate and focused on the areas most crucial to G.D.'s development, which included socialization.  The fact that the April 28, 2010 IEP did not incorporate each of the goals as specifically written by BECA does not result in the conclusion, as G.D. and his Parents seem to argue, that the goals prepared and proposed for inclusion by the IEP team were inappropriate and did not provide a FAPE for G.D.  Although they may have been phrased or worded differently, the majority of BECA's significant goals, such as correctly responding to wh- questions and requiring G.D. to join in peer conversations, were, in fact, incorporated as

1  goals in the April 28, 2010 IEP.  With respect to the BECA goals
2  that were not incorporated in the April 28, 2010 IEP, the members
3  of the IEP team, based on their observations of G.D. and their
4  knowledge of the needs of special education students such as G.D.,
5  appropriately determined that the BECA goals were either
6  unnecessary or not age appropriate.  Thus, the ALJ properly
7  concluded based on the evidence that the goals proposed in the
8  April 28, 20110 IEP addressed G.D.'s needs and provided meaningful
9  benefits, even though they did not include each and every goal
10 proposed by BECA.

11      In addition, the main and most important behavioral goal
12 identified in the April 28, 2010 IEP – to maintain and generalize
13 social skills across play opportunities – included a number of
14 specific socialization goals for G.D., such as initiating and
15 joining group play activities, responding to play statements,
16 sustaining play, and appropriately transitioning between play
17 activities for the duration of recess without adult assistance,
18 adequately considered and incorporated the goals proposed by BECA.
19 Even Dr. Freeman, who testified on behalf of G.D., admitted that
20 the 2010 IEP goals of working on initiating and joining play
21 activities with peers, transitioning effectively from one activity
22 to another, sustaining play, responding to and asking wh-
23 questions, and following the classroom routine were adequate and
24 appropriate goals for improving G.D.'s principal area of deficit,
25 which was his lack of socialization skills.  Moreover, G.D. was
26 offered services, including behavior intervention services and
27 speech and language therapy which adequately addressed G.D.'s
28 development in those areas of concern.  *See, e.g., K.D.*, 665 F.3d

at 1125 (where IEP showed a focus on evaluating the areas most crucial to the student's development and offered related services, the Court held that the goals were reasonably calculated to enable the student to receive educational benefits and provided the student a FAPE).

Accordingly, the Court concludes that the behavioral goals in the April 28, 2010 IEP were appropriate and provided G.D. a FAPE.

**III. CONCLUSION**

For all the foregoing reasons, the Court affirms the ALJ's decision in this matter as both careful, reasoned, and supported by the preponderance of the evidence. The Court concludes that: (1) the record demonstrates that the District provided G.D. with a FAPE in the April 28, 2010 IEP; and (2) therefore, G.D. and his Parents are not entitled to relief.

The parties are hereby ordered to meet and confer and agree on a joint proposed Judgment that provides for judgment consistent with these Findings of Fact and Conclusions of Law. The parties shall lodge the joint proposed Judgment with the Court on or before March 14, 2012. In the unlikely event that counsel are unable to agree upon a joint proposed Judgment, the parties shall each submit separate versions of a proposed Judgment along with a declaration outlining their objections to the opposing party's version no later than March 14, 2012.

Dated: March 8, 2011

                                        JOHN F. WALTER
                                UNITED STATES DISTRICT JUDGE